NOT DESIGNATED FOR PUBLICATION

No. 116,995

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
W.N. II,
A Minor Child.


MEMORANDUM OPINION


Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed July 7, 2017. Affirmed.


*Christopher Cuevas*, of Kansas City, for appellant natural father.


*Crystal Elaine Ellison*, assistant district attorney, and *Mark A. Dupree, Sr.*, district attorney, for appellee.


Before ARNOLD-BURGER, C.J., STANDRIDGE and SCHROEDER, JJ.


*Per Curiam*:  Natural father, W.N. (Father), had his parental rights to W.N. II terminated based on the district court's findings that he used drugs and alcohol to a degree that rendered him an unfit parent; he was physically, mentally, or emotionally neglectful of W.N. II; reasonable efforts to rehabilitate the family had failed; Father put in an insufficient effort to change his circumstances to meet the needs of W.N. II; and he failed to maintain regular contact with W.N. II and to carry out a reasonable plan aimed at reintegration.

After review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found by clear and convincing evidence that W.N. II was a child in need of care and that his Father was not only unfit to

1

care for him properly but that his Father's conduct was unlikely to change in the foreseeable future. In addition, the district court did not err in finding that termination of Father's rights was in W.N. II's best interests. Accordingly, we affirm.

FACTUAL AND PROCEDURAL HISTORY

On September 14, 2014, W.N. II's mother, K.K. (Mother), called emergency personnel to her home. When they arrived, she reported that she was bipolar, had been off her medication for 3 to 4 months, was sleep deprived, and needed to go to the hospital. Mother reported that she had contacted Father, who said he was not coming home. Police then took W.N. II into protective custody.

Father was contacted by the Department of Children and Families (DCF) the following day and notified that W.N. II had been taken into State custody. Father alleged that the reason he had not gone to Mother's home the day before to care for W.N. II was that Mother had called him earlier in the day and "told him that she had told the police that he had 'jumped on her' because she wanted to obtain 'victim's assistance money,'" so he was afraid he would be arrested if he went to the home. Father told DCF that he would like W.N. II to be placed in his custody. He admitted to DCF that he had pending charges for possession of cocaine and that he had used marijuana and Xanax in the past 2 weeks to help relieve stress. At the time, Father did not have a home of his own but was staying with a friend.

After his interactions with DCF on September 15, 2014, Father dropped out of contact with all individuals working on W.N. II's case until August 2016, and attended no hearings in the case until the hearing on the State's motion for termination in November 2016. On August 19, 2016, Father contacted Charissa Boldridge, the court services officer assigned to W.N. II's case, and told her that he wanted to become involved with W.N. II. Father advised her that he had been seeing W.N. II during Mother's

2

unsupervised visits since May, but decided that he needed to become formally involved because Mother's mental health had deteriorated and she was being admitted into Osawatomie State Hospital.

After his nearly 2-year absence from W.N. II's life, Father set up a visit with W.N. II on August 23, 2016. Father did not show up for the visit or notify anyone that he would be unable to attend it. Father was also a no-call/no-show to visits scheduled on September 15 and November 4. Additionally, Father missed visits on October 7 and 21, though he called to alert staff that he would be unable to attend, and failed to show up for a meeting with staff on November 17 at which he was to arrange a visit with W.N. II for over the holidays. Father did, however, visit with W.N. II on September 28, October 14, and October 28. When visits occurred, Samantha Broz, the case manager, testified that they were appropriate, though Kay Heikes, W.N. II's therapist, noted that W.N. II appeared to have anxiety and dysregulation surrounding the visits.

Between August and November 2016, Father took a number of other steps aimed at becoming a fit parent: he entered into a lease for an apartment of his own, obtained an initial psychosocial evaluation, and appeared to have completed an assessment from the Heartland Regional Alcohol and Drug Assessment Center (RADAC). However, Father failed to comply with a number of court orders including: following the recommendations of the RADAC, completing a domestic violence assessment, completing a drug and alcohol assessment, obtaining or maintaining steady income, providing negative random urinalysis tests (UAs), and resolving his outstanding legal issues.

At the time of the termination hearing, Father was in jail. Father had been sentenced in June 2016 to an underlying prison sentence of 12 months with 12 months' probation for possession of cocaine. A motion to revoke his probation had been filed on October 28 for failure to report, positive UAs, admitted drug use, and failure to show for

3

UAs. A second motion to revoke probation was filed on November 14, after a missed UA. Father failed to appear at the revocation hearing that was scheduled for November 18. After he missed the hearing, a warrant was issued and Father was arrested. At the time of the termination hearing, it was unknown whether Father's probation would be revoked and he would be ordered to serve his underlying 12-month sentence.

Both witnesses who offered a recommendation on the issue recommended terminating Father's parental rights.

ANALYSIS

On appeal, Father argues that the State failed to prove by clear and convincing evidence that he was an unfit parent for W.N. II. When an appellate court reviews a district court's decision to terminate parental rights, it should "consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008).

The Revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a child in need of care and "the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness and contains a separate list of factors to consider when a child is not in the physical custody of his or her parent(s). K.S.A. 2016 Supp. 38-2269(b), (c). Any one of the factors listed in K.S.A. 2016 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f). Upon making a finding of unfitness of the parent, "the court shall consider

4

whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2016 Supp. 38-2269(g)(1).

Here, the district court found that there was clear and convincing evidence that Father was an unfit parent for W.N. II and that he was unlikely to become a fit parent in the foreseeable future because he engages in excessive use of intoxicating liquors or narcotic or dangerous drugs to such an extent that he is unable to care for W.N. II and has physically, mentally, and emotionally neglected W.N. II. Additionally, the district court found that reasonable efforts were made by appropriate agencies to rehabilitate the family but that the efforts failed because Father "demonstrated an utter lack of effort . . . to adjust his circumstances, conduct, or conditions to meet the needs of the child." For instance, Father failed to maintain regular visitation, contact, or communication with W.N. II or his care takers and failed to carry out a reasonable reintegration plan. In making these findings, the district court cited to the relevant statutory subsections: K.S.A. 2016 Supp. 38-2269(b)(3), (4), (7), and (8) and K.S.A. 2016 Supp. 38-2269(c)(2) and (3). The district judge concluded:  "[G]iving primary consideration to the physical, mental, and emotional needs of the subject child, I do find that termination of [the] parental rights is in the best interest of the child."

Reviewing the record in the light most favorable to the State, there is clear and convincing evidence to support the district court's findings.

For K.S.A. 2016 Supp. 38-2269(b)(3) to provide a basis for the district court to terminate Father's parental rights, it needed to find that drug or alcohol use rendered Father incapable of caring for W.N. II. The evidence in the record supports that finding. During the short period that Father had been involved in W.N. II's case, he was on probation for possession of cocaine and admitted to or tested positive for drug use three times. Father failed to produce a clean UA during that period of time and failed to show up on four occasions to provide a UA sample. Additionally, Father failed to obtain a drug

5

and alcohol assessment or seek or attend drug or alcohol related treatment. Father could not have provided an appropriate home for W.N. II while he continued to use drugs, and he showed no sign that he was attempting to change or would be able to change his drug use habits in the foreseeable future.

To find Father unfit under K.S.A. 2016 Supp. 38-2269(b)(4), the court needed to find that Father was physically, mentally, or emotionally neglectful. Although Father alleged to case workers that he saw W.N. II at least occasionally starting in May 2016 during Mother's unsupervised visits the only sanctioned visits and visits for which there was evidence occurred between August and October of 2016—nearly 2 years after Father was taken into State custody. Even then, out of the seven possible visits Father could have had with W.N. II, Father only attended three. There was evidence that during that time, Father provided some clothes and toys to W.N. II, but he did not appear to provide any other support to W.N. II during his time in State custody. One bag of toys and three visits during 2 years does not overcome the finding that Father physically, mentally, and emotionally neglected W.N. II.

Under K.S.A. 2016 Supp. 38-2269(b)(7), parental rights may be terminated when there has been a "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." Throughout his time in State custody, W.N. II and his parents received, or had the option of receiving, services through a variety of agencies and individuals. Despite the team of support staff attempting to aid in rehabilitation, Father was unable to take the steps necessary to show that he would be able to care for W.N. II.

K.S.A. 2016 Supp. 38-2269(b)(8) provides a basis to terminate a parent's rights when the parent has shown a "lack of effort . . . to adjust [his or her] circumstances, conduct or conditions to meet the needs of the child." It is unclear where Father was or what he was doing during the 1 1/2 years that W.N. II was in State custody, but his

6

complete absence from W.N. II's life is an indication that he was either unwilling or unable to modify his life to fit W.N. II's needs. Additional indications of his lack of effort to modify his life so that he could care for W.N. II include Father's failure to resolve his ongoing legal issues, failure to participate in court ordered assessments, and continued drug use.

Finally, when a child has been in an extended out-of-home placement, a district court may also consider whether a parent failed to maintain regular visitation, contact, or communication with the child or the custodian of the child and whether the parent failed to carry out a reasonable plan for reintegration. K.S.A. 2016 Supp. 38-2269(b)(9), (c)(2) and (3). When considering the parent's involvement "the court may disregard incidental visitations, contacts, communications or contributions. K.S.A. 2016 Supp. 38-2269(c). Here, any efforts Father made were toward communication and reintegration certainly appear to be incidental considered in light of the entire period during which W.N. II was in State custody.

Any one of the statutory factors standing alone may provide a sufficient basis upon which the district court may revoke a person's parental rights. K.S.A. 2016 Supp. 38-2269(f). Here, there was clear and convincing evidence to support the district court's determination that six factors all indicated that Father was not a fit parent nor, contrary to Father's assertions, likely to become one in the near future.

In addition to finding a parent unfit, a district court terminating a parent's rights must consider whether termination is in the best interests of the child. K.S.A. 2016 Supp. 38-2269(g)(1). Here, the district court, considering the physical, mental, and emotional needs of W.N. II, found that termination of Father's parental rights was in W.N. II's best interests. Based on the testimony regarding Father's lack of involvement in W.N. II's life, continuing drug use, and pending legal issues, and considering that Father had spent all but 3 months of his son's life in State custody, the record contains clear and convincing

7

evidence that it was in W.N. II's best interests to have his connection to Father severed so that he could move forward with finding a permanent family.

Affirmed.